# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| vs. | : | |
| | : | |
| DENNIS BURNETT | : | NO. 08-201-3 |

## MEMORANDUM

**PRATTER, J.**                                                                                                              **FEBRUARY 17, 2010**

## INTRODUCTION

    Notwithstanding his guilty plea, Dennis Burnett either wants another chance to demonstrate his tenacity and tolerance for risk by fighting the serious Hobbs Act and gun charges levied against him, or he hopes to negotiate a more favorable plea agreement with the Government. Apparently, Mr. Burnett suspects he might have done better on July 14, 2009 when he elected, during the start of jury selection in his trial, to plead guilty and accept a "C-plea" pursuant to Rule 11 (c)(1)(C). The plea was the product of multiple proffer meetings and negotiations that had started some six months earlier; it secured for him a sentence of incarceration some seven years under the otherwise mandatory minimum prison time he was facing.

    Now as he faces sentencing, Mr. Burnett moves to withdraw his guilty plea, arguing, on the basis of what is essentially a self-diagnosis of transitory incompetence (albeit a diagnosis that is retrospectively somewhat buttressed by the opinion an expert witness[1]), that he was not

---

[1] Mr. Burnett's motion is supported by the report and testimony of Dr. Pogos H. Voskanian, a Board-certified psychiatrist who has testified frequently in federal court. Dr. Voskanian examined Mr. Burnett on November 30, 2009. Dr. Voskanian's December 11, 2009

competent to fully consider, weigh and make his choices on the day he entered the plea so that he could get the best result possible for himself. The Court rejects Mr. Burnett's argument and has denied his motion for the reasons discussed below.

**LEGAL STANDARD**

Mr. Burnett has no automatic right to withdraw his guilty plea. United States v. Martinez, 785 F. 2d 111, 113 (3rd Cir. 1986). Indeed, given the solemn thoroughness required by the Federal Rules of Criminal Procedure for the evaluation of the tendering and acceptance of a guilty plea,[2] it is understandable that a defendant such as Mr. Burnett may not lightly withdraw a guilty plea. United States v. Hyde, 520 U.S. 670, 676 (1997); Brady v. United States, 397 U.S. 742, 748 (1970); United States v. Jones, 336 F. 3d 245, 252 (3rd Cir. 2003).

Mr. Burnett bears the burden of establishing that there are valid grounds for withdrawing his guilty plea and "that burden is substantial." Jones, 336 F. 3d at 252. As part of that burden, Mr. Burnett must also present a persuasive reason why he took contradictory positions under oath at his guilty plea hearing, lest other defendants be tempted to tie up the criminal justice system with disingenuous, and then recanted, Rule 11 statements. See Blackledge v. Allison, 431 U.S. 63, 73-74 (1977); United States v. Jones, 979 F. 2d 317, 318 (3rd Cir. 1992).

---

report was admitted into evidence at the hearing in this matter, and Dr. Voskanian testified during that hearing. He concluded: "Due to multiple chronic stressors and an acute over imposed stressor [learning of his ailing grandfather's death], Mr. Burnett on or about July 14, 2009 was likely somewhat more incompetent than competent . . .". Dr. Voskanian's report ("Rpt. at __") and testimony are discussed in greater detail below. Citations to the two-day hearing on Mr. Burnett's Motion to Withdraw Guilty Plea are designated "Motion Hrg. [date] N.T. __."

[2]The transcript of the July 14, 2009 guilty plea hearing for Mr. Burnett covers some 70 pages; the proceeding spanned more than 90 minutes. Reference to specific portions of the hearing as transcribed will be cited in this Memorandum as "G.P. Hrg. N.T. ____."

To determine whether a defendant has met his substantial burden, the Court normally must weigh three factors: (1) whether the defendant asserts his innocence; (2) whether the Government would be prejudiced by the withdrawal; and (3) the strength of the reasons for seeking to withdraw the plea. United States v. Brown, 250 F. 3d 811, 815 (3rd Cir. 2001); United States v. Trott, 779 F. 2d 912, 915 (3rd Cir. 1985). "A shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons . . ." Brown, 250 F. 3d at 815; see also Jones, 979 F. 2d at 318; Masciola v. United States, 469 F. 2d 1057, 1058-59 (3rd Cir. 1972). A claim such as Mr. Burnett's, i.e., that he lacked the mental competency to enter a guilty plea, is analyzed under the third factor - - the strength of the reasons for seeking to withdraw the plea.

The legal standard for measuring a criminal defendant's competency to plead guilty is the same as the competency standard for standing trial. Godinez v. Moran, 509 U.S. 389, 399-400 (1993); Taylor v. Horn, 504 F. 3d 416, 430 (3rd Cir. 2007). Thus, the Court must consider whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and whether the defendant possesses a rational as well as factual understanding of the proceedings against him. Dusky v. United States, 362 U.S. 402, 402 (1960); Taylor, 504 F. 3d at 430.[3]

The Court's review of the record in this case and serious, in-person evaluations of Mr. Burnett's performances in these proceedings convince the Court that Mr. Burnett firmly possessed - - and exercised - - the requisite rationality when he entered his guilty plea in this

---

[3]A court is not required to "make a competency determination in every case in which a defendant seeks to plead guilty," rather, "a competency determination is necessary only when a court has reason to doubt a defendant's competence." Godinez, 509 U.S. at 402, n.13.

case.[4]

**DISCUSSION**

While the key proceeding to examine in this matter certainly is Mr. Burnett's July 14, 2009 guilty plea hearing, Mr. Burnett's actions on that day - - be they evidence of his competence or not - - cannot be fully appreciated in a vacuum. Therefore, some context is appropriate.

Mr. Burnett and a co-defendant were indicted on December 16, 2008 by a federal grand jury's issuance of a second superceding indictment. Specifically, Mr. Burnett was charged with two Hobbs Act robberies and aiding and abetting. He was also accused in two other counts with using and carrying and aiding and abetting the use and carrying of a firearm during crimes of violence. Mr. Burnett had been arrested the prior month in North Carolina on the predecessors to these charges. According to what he later told Dr. Voskanian (the expert retained to consider his competence) Mr. Burnett began to experience trouble sleeping when he was arrested. Motion Hrg. 1/28/10 N.T.19. Mr. Burnett arrived at the Federal Detention Center in Philadelphia on December 19, 2008, and he met with his first court-appointed counsel, David Rudenstein, on December 23, 2008. Reportedly, Mr. Rudenstein recommended that Mr. Burnett favorably consider negotiating a plea agreement as early as that initial meeting.

On January 12, 2009, Mr. Burnett, accompanied by Mr. Rudenstein, went to his first, lengthy proffer meeting with the Government. He fully understood the purpose of the meeting. From all accounts Mr. Burnett was an active and willing participant in the proffer meeting. In February 2009 Mr. Burnett himself wrote and sent a letter to the Acting United States Attorney

---

[4]Because of the Court's ruling, no analysis of the other two requisite factors for withdrawal of a guilty plea is necessary.

professing remorse for his misconduct, eagerness to be helpful to the Government and interest in making a deal. Mr. Burnett participated in a second proffer meeting with the Government on March 27, 2009[5] during which, according to the Government, having been presented with a cooperation guilty plea agreement, Mr. Burnett "expressed some concern about having to plead guilty to two Section 924(c) counts which exposed him to mandatory minimum sentences totaling 32 years imprisonment." Government's Opposition to Defendant Dennis Burnett's Motion to Withdraw Guilty Plea at n.3.

In early May 2009 the Government was informed that Mr. Burnett was no longer interested in continuing his considerable cooperation with law enforcement. Instead, he expressed an intention to proceed to trial. Thus, on May 12, 2009, a third superceding indictment issued, adding a conspiracy count and naming additional defendants. Mr. Burnett was arraigned on the charges on May 13, 2009 at the start of a hearing that had been called as a result of Mr. Burnett's March 27, 2009 letter to the Court (received by the Court on April 28, 2009) in which Mr. Burnett asked the Court to provide him with new counsel.

At the May 13, 2009 hearing Mr. Burnett confirmed his continued distrust in his counsel due to his disagreement and, thus, dissatisfaction, with counsel's view and advice concerning the case. 5/13/09 Hrg. N.T. 6-7. Notwithstanding his advice for a different strategy, counsel remained ready, willing and able to represent Mr. Burnett at trial, but Mr. Burnett maintained his insecurity in going forward with counsel. 5/13/09 Hrg. N.T. 12. He wanted a new lawyer, even though it would likely delay a trial. 5/13/09 Hrg. N.T. 12-15. A propos of the issue now before

---

[5]Mr. Burnett was not accompanied by counsel to this meeting but had received his counsel's advice in connection with it and was fully desirous of participating in the meeting even in counsel's necessary absence.

5

the Court concerning tough choices Mr. Burnett has had to make, Mr. Burnett realized that he was faced with a choice that did not please him, ("So I am kind of stuck... .") namely, either (1) continue with a lawyer he no longer preferred in order to enhance the chances for an earlier disposition or (2) secure new counsel along with an almost certain delay in the proceedings. 5/13/09 Hrg. N.T. 13-14. Based upon the Court's direct assessment of the poor interaction between Mr. Burnett and counsel, the Court appointed new counsel, William Cannon, to represent Mr. Burnett going forward. Before the May 13 proceedings adjourned, Mr. Burnett himself informed the Court of a further request by making an "oral motion for [his] grand jury transcripts and a Rule 16 motion." 5/13/09 Hrg. N.T. 18-19. In keeping with the Court's customary practices for represented defendants, the Court declined the pro se motion, pending Mr. Burnett's new counsel's possible submission of an equivalent motion after consultation. 5/13/09 Hrg. N.T. 19.

A hearing to address a number of pre-trial motions was held on July 7, 2009. Mr. Burnett attended, along with his new counsel who demonstrated fully up-to-date knowledge about the substantive and procedural posture of the case, both generally and as related to Mr. Burnett's individual issues. At that point, it appeared likely that trial was approximately a week away, so that many details preparatory to the start of trial were discussed. 7/7/09 Hrg. N.T. 42-52; 56-58. At no time during this hearing did Mr. Burnett express dissatisfaction or frustration with his attorney's services or counsel's responsiveness. Indeed, a significant portion of the hearing concerned discovery demands made on behalf of Mr. Burnett and responded to by the Government, as well as yet more pretrial motions to be pursued for Mr. Burnett before the upcoming trial.

The remaining pre-trial motions were addressed on July 13, 2009, most significantly the Government's motion in limine to enforce Mr. Burnett's proffer agreement to allow for the admission into evidence at trial Mr. Burnett's proffer admissions to rebut contrary defense evidence or argument during trial. Mr. Burnett, as well as his prior lawyer, David Rudenstein, testified during the July 13 hearing. The specific issue at hand was Mr. Burnett's understanding at the time of the proffers as to the circumstances under which his proffer statements could become trial evidence and his waiver in connection with such issues. Mr. Burnett testified at length, but never disavowed the truth of his statements during the proffer statements. 7/13/09 Hrg. N.T. 50, 55, 60. Likewise, at no time during the July 13th hearing did Mr. Burnett express dissatisfaction with his counsel. Following a luncheon break, the Court ruled upon the motion concerning possible use of Mr. Burnett's proffer statement, confirming that the proffer statement could be introduced into evidence only if Mr. Burnett himself testified. However, the Court also admonished defense counsel that his examination of witnesses and arguments likewise could not contradict the defendant's proffer statement. At the end of the hearing and before calling in the jury panel for the commencement of trial, the Court asked "Anything else before we move [on]?" 7/13/09 Hrg. N.T. 105. There was no response. Jury selection then began.[6]

---

[6] During the lunch break on July 13, Mr. Burnett apparently learned from Mr. Cannon that Mr. Cannon had been told that day by Mr. Burnett's mother who was in the courtroom that Mr. Burnett's maternal step-grandfather had died the day before. No mention to the Court or to the Government was made about this development (or about Mr. Burnett's awareness of it or any reaction by him to this news) until some three months later when Mr. Burnett submitted an October 5, 2009 pro se motion to withdraw his guilty plea. In this motion Mr. Burnett states for the first time to the Court that learning of this death caused him a "substantial amount of emotional duress." Throughout the hearings and briefings on this issue relating to the death of Williams Sanders, Mr. Sanders is referred to as Mr. Burnett's "grandfather." In the Federal Bureau of Prisons Psychology Data System report for July 21, 2009, staff psychologist Andrea Boardman reported that Mr. Burnett reported the **(Continuation of footnote on next page)**

During the overnight break after the July 13 court session, Mr. Burnett's counsel and the Government discussed potential terms for a possible guilty plea agreement under Rule 11(c)(1)©. During this same break, Mr. Burnett's co-defendant decided to plead guilty and co-operate against Mr. Burnett, adding to the issues for Mr. Burnett to weigh along with the Court's pre-trial rulings. Before jury selection resumed on July 14, 2009, a draft plea agreement was provided to Mr. Burnett's counsel in which the Government would stipulate to a 25-year term of incarceration in return for Mr. Burnett's guilty plea to four of the counts in the third superceding indictment. The deal would not be held open once jury selection was complete and openings began. After the lunch break on July 14, 2009, Mr. Burnett's counsel notified the Government that Mr. Burnett had signed the "C-plea" agreement. Informed of this development, the Court proceeded with a change of plea hearing.

Mr. Burnett's father and grandmother were present for the entire guilty plea hearing. The guilty plea colloquy followed the Court's customary format. After being sworn, Mr. Burnett was reminded that he could ask questions whenever he wanted, including conferring privately with his counsel. GP Hrg. N.T. 2, 4. He acknowledged his sworn obligation to tell the truth and told the Court he was ready to proceed. GP Hrg. N.T. 3, 5. Mr. Burnett described himself as 27 years old, having earned an associates degree after graduating from high school; he was unimpaired by any illegal substances, alcohol or medicine (or lack of prescribed medicine), and he had no recent history of seeking medical, mental or emotional health care. GP Hrg. N.T. 10. In response to the

---

"recent loss" of his maternal step-grandfather." Motion Hrg. 1/28/10, Ex. D-3. Throughout the remainder of this Memorandum Opinion, Mr. Sanders is referred to simply as Mr. Burnett's grandfather.

Court's question "How do you feel?" Mr. Burnett and the Court had the following, normally paced exchange:

>Mr. Burnett: "I can't say I feel good right now."
>
>Court: "That's fair. But you understand everything [that] is going on?"
>
>Mr. Burnett: "Yes."
>
>Court: "And you think you are thinking clearly?"
>
>Mr. Burnett: "Yes."

GP Hrg. N.T. 11.

Mr. Burnett acknowledged that he had enough time to confer with counsel about the plea issues, and he confirmed that he was satisfied with his lawyer's representation and with counsel's advice. GP Hrg. N.T. 12.

Thereafter, the proposed plea agreement was described in detail. Mr. Burnett swore that he had read and understood the agreement before he signed it. GP Hrg. N.T. 18-19. He admitted knowing that a guilty plea would amount to a waiver of any discovery dispute he had or thought he had with the Government. GP Hrg. N.T. 21. The Court reminded Mr. Burnett that if he did not want to plead guilty he could go forward with the trial and resume selecting the jury, and Mr. Burnett acknowledged that he was aware of that right and opportunity. GP Hrg. N.T. 22. He was reminded of what the Government would have to prove in order to secure convictions on the charges, and he thereafter admitted the facts attendant to the charges against him. GP Hrg. N.T. 33-54. He expressly acknowledged his acceptance of the stipulation to the 25-year term of imprisonment. GP Hrg. N.T. 15.

Before accepting Mr. Burnett's plea, the Court directly inquired of defense counsel and the Government's counsel if either of them had any doubts as to Mr. Burnett's competence to change and enter a plea; both attorneys stated they had no doubt that Mr. Burnett was competent to plea guilty. GP Hrg. N.T. 66. They also assessed the plea as voluntary. GP Hrg. N.T. 67.

Mr. Burnett pled guilty. Having observed him closely during the hearing, and, indeed for a number of days before, the Court concluded that Mr. Burnett was calm, fully mentally alert, capable and competent to enter a knowledgeable, intelligent and voluntary plea. GP Hrg. N.T. 69-70. Sentencing was set for October 15, 2009. Before adjourning, the Court asked "Are there any other issues or matters to discuss?" to which the response from all parties was in the negative. The Court then addressed Mr. Burnett individually and said, "I hope you understand how important all these things were for you and you also [com]ported yourself very honorably and admirably," to which Mr. Burnett promptly responded, "Thank you, Your Honor." GP Hrg. N.T. 72. The awaiting jury panel was released after the hearing concluded.

No mention was made at the plea hearing of Mr. Sanders' death. No mention of distress or distraction on the part of Mr. Burnett was made. No concern for Mr. Burnett's ability to fully appreciate the seriousness of his situation or the significance of his choices was expressed to the Court, and none would have been expected, based upon the Court's own direct observations of Mr. Burnett.

On July 20, 2009, an official at the Federal Detention Center raised a question about Mr. Burnett's possible risk to himself as a result of comments made in a letter from Mr. Burnett to his girlfriend. A staff psychologist from the F.D.C. met with Mr. Burnett on July 21, 2009 to make a suicide watch assessment. Motion Hrg. 1/28/10 Ex. D-3. During the interview, while Mr.

Burnett mentioned Mr. Sanders' death, Mr. Burnett also demonstrated considerable upset upon learning that his co-defendant had decided to cooperate against him. At the conclusion of the interview, the mental health professional concluded that Mr. Burnett did not warrant a formal suicide watch, special placement or psychological observation, placement on the monitor list or special housing. The psychologist noted that Mr. Burnett was to be checked monthly and Mr. Burnett was reminded how to secure psychological services if he felt the need for counseling. The psychologist assessed Mr. Burnett as a "young...inmate facing long sentence." Id. Additional interaction with the psychology staff at the Federal Detention Center on July 28, 2009 led Mr. Burnett to be displeased upon being told that his housing arrangements might be changed. Id. Following that July 28 meeting with the Federal Detention Center psychologist, Mr. Burnett was reportedly working with books given to him in order to "analyze himself." Id.

Mr. Burnett's second counsel, Mr. Cannon, filed a motion to withdraw as counsel on September 16, 2009, which the Court considered at an October 7, 2009 hearing, the same day that Mr. Burnett filed a pro se motion to withdraw his guilty plea. The Court permitted Mr. Cannon to withdraw his appearance, appointed Christopher Furlong to be Mr. Burnett's third lawyer, and the Court denied without prejudice the pro se motion to withdraw the guilty plea, pending new counsel's consideration in consultation with Mr. Burnett of the appropriateness of such a motion.

Several weeks later Mr. Burnett's new counsel secured the Court's authorization to retain Dr. Voskanian who thereafter examined Mr. Burnett and prepared a report. Dr. Voskanian testified in support of the December 23, 2009 motion that counsel filed requesting permission for Mr. Burnett to withdraw his guilty plea. The two-day hearing on the motion began on January

28, 2010 and concluded on February 1, 2010.

Dr. Voskanian's task was to evaluate Mr. Burnett's competence - - that is, whether he had sufficient ability to consult with his lawyer with a reasonable degree of rational and factual understanding of the proceeding against him - - at the time of the guilty plea hearing that took place some four months before the date of his examination of Mr. Burnett. It was a task Dr. Voskanian recognized as "hard to do." Motion Hrg. 1/28/10 N.T. 14. Nonetheless, Dr. Voskanian concluded that although Mr. Burnett is and was generally competent, he was "likely somewhat more incompetent than competent" on July 14, 2009 when he entered his guilty plea. Rpt. at 2, 16. The reason for this, according to Dr. Voskanian, was that the additional acute "stressor" of learning on July 13 about his grandfather's recent death - - significantly, according to Dr. Voskanian, the first time Mr. Burnett was sober when he lost a loved one - - on top of the stress of facing trial was simply too much for Mr. Burnett to deal with. Motion Hrg. 1/28/10 N.T. 18-20; 24; 38-40; Rpt. at 2, 12, 16.

Notwithstanding Dr. Voskanian's conclusion (even as marginally equivocal or hedging as it sounds, e.g., "likely somewhat more . . ."), much of the information contained in Dr. Voskanian's report and in his testimony fundamentally undermines even that arguably ambivalent opinion and prompts the Court to reject the notion that Mr. Burnett was not legally competent on July 14 when he pled guilty. Indeed, Dr. Voskanian's testimony and report actually disclose a host of other reasons for Mr. Burnett's motion, none of which reasons justify the motion.

Throughout his November 30, 2009 interview with Dr. Voskanian, Mr. Burnett admitted that he now wanted to fight the case "for his family" because he thought he was putting his

family under stress by "being away."  He knows he is facing possibly life in prison.  Motion Hrg. 1/28/10 N.T. 20; Rpt. at 11.  Mr. Burnett repeatedly told Dr. Voskanian that he has considerable antipathy for his lawyers (e.g., he has "a big trust issue with lawyers") and doubts their efforts on his behalf over the course of the prior year during which Mr. Burnett candidly admitted his on-going interest in negotiating the best deal he could.  Motion Hrg. 1/28/10 N.T. 18-19; 22; 35; Rpt. at 13.  Dr. Voskanian volunteered his own unsupported criticism of Mr. Burnett's counsel and did not hide his assumption that counsel would abandon his ethical obligations to Mr. Burnett in order to escape what Dr. Voskanian dubbed counsel's "malpractice."  Motion Hrg. 1/28/10 N.T. 47; 51; 52-53.  Indeed, ostensibly because Mr. Burnett was blaming his lawyer for having "bullied" him into pleading guilty and was accusing counsel of being incompetent or negligent, Dr. Voskanian did not speak with either of the two prior counsel concerning Mr. Burnett's condition or conduct at the guilty plea hearing or otherwise.  Motion Hrg. 1/28/10 N.T. 17; 51.  From the Court's perspective, Dr. Voskanian's hasty and undocumented conclusions about Mr. Burnett's lawyer(s) and the failure to secure their input in the avowedly "hard" challenge of a retrospective competence evaluation only call into significant question the reliability of these conclusions about Mr. Burnett.

The defense lawyer was not the only person who was at the change of plea hearing who Dr. Voskanian did *not* interview in order to try to gather first-hand observations about Mr. Burnett on July 14 or otherwise.  He also declined to speak with Mr. Burnett's father or grandmother who were at the hearing; he did not speak to the prosecutor; and he did not speak to

the assigned probation officer. Motion Hrg. 1/28/10 N.T. 39.[7]

Dr. Voskanian did read the transcript of the July 14 guilty plea hearing, but he did not review Mr. Burnett's testimony the day before (i.e., before Mr. Burnett had learned about his grandfather's death) for comparison - - or any - - purposes. Motion Hrg. 1/28/10 N.T. 34; Rpt. at 1. Tacitly acknowledging that for anyone then present, Mr. Burnett's conduct at the guilty plea hearing would not have prompted concern about his competence, Dr. Voskanian opined that for any given individual a person's emotions would not come out during such a hearing because questions at guilty plea hearings are "goal oriented questions", not "descriptive," and, thus, are "typical court proceedings." Motion Hrg. 1/28/10 N.T. 25.[8]

Mr. Burnett professed to Dr. Voskanian that he lost his motivation to defend himself once he learned about his grandfather's death. Dr. Voskanian emphasized this self-assessment throughout his report and testimony and appeared to accept it without question, giving this loss of motivation great credence as a lynchpin for his opinion. See, e.g., Rpt. at 12; Motion Hrg. 1/28/10 N.T. 21. However, Dr. Voskanian did not gauge the supposed reason for the lack of motivation (namely, the grandfather's death) against other information Mr. Burnett had also imparted to him, specifically that he had had no contact with anyone in his family for perhaps as long as two years before his November 2008 arrest as to some family members or eight months before his guilty plea hearing as to others and had had no contact with this grandfather for several

---

[7]Of course, Dr. Voskanian did not personally observe Mr. Burnett testify in *any* court proceeding. Dr. Voskanian's primary source of information was Mr. Burnett himself.

[8]In this regard, Dr. Voskanian's opinion of court proceedings may be at odds with the United States Supreme Court. See n. 3, supra., noting the Court's opinion eschewing the need for the colloguing court to conduct competency hearings at typical guilty plea hearings.

14

years, even though the grandfather had been sick for some time. Motion Hrg. 1/28/10, N.T. 20; 40; Rpt. at 7. Beyond this factual inconsistency, and of greater damage to the defense motion, Dr. Voskanian and Mr. Burnett both fail to recognize that under governing case law, not even a complete lack of "motivation" translates into legal incompetence. Stated differently, "lack of motivation" is simply not the equivalent of the *inability* to consult with counsel with a reasonable degree of rational understanding of the proceedings. Given the daunting risks of trial, the delicate evidentiary balancing, and the late-breaking development of a co-defendant's decision to co-operate with the Government, it would not be surprising to have very little "motivation" to go forward with trial. These may well be deflating developments, but they did not blur Mr. Burnett's vision of a very beneficial plea agreement. Moreover, if one were to accept Mr. Burnett's and Dr. Voskanian's argument that this "straw on the camel's back," i.e., the grandfather's death, caused Mr. Burnett to lose all motivation and not care what happened to him, then one would *not* expect that he would have adamantly pressed his lawyer for a continuance of trial - - if he did not care what happened as he now says were his feelings at the time, then he would have been satisfied to sit in court and let the chips fall where they may. This is yet one more inconsistency that undermines the premise of this motion.

 Dr. Voskanian offers no discussion of the supposed equivalence of the two concepts of lack of motivation and incompetence, and Mr. Burnett cites no judicial opinion that has accepted "lack of motivation" as meeting the burden to prove legal incompetence. This Court is not prepared to assume or find such equivalence, especially where, as here, Mr. Burnett as the proponent of the equivalence of such concepts has had four months or more to study various arguably pertinent mental and emotional health literature, Motion Hrg. 1/28/10 Ex. D-3, as well

15

as bereavement process literature, Rpt. at 15, and reports by mental health professionals whose language Mr. Burnett has obviously adopted.[9] Nonetheless, the Court observes that after making these declarations Mr. Burnett expresses more annoyance and disagreement with prior counsel - - annoyance and disagreement that apparently existed in May, June and July of last year (before the death of Mr. Sanders) without disclosure to the Court - - than upset about his grandfather's death.[10]

The Court is unpersuaded by Mr. Burnett's now carefully calibrated current descriptions of himself at the guilty plea hearing more than six months ago, especially given his current motivation to return to the status quo ante in order to try to negotiate an even better deal for himself. However, none of Mr. Burnett's current descriptions of his previous condition can change what actually occurred and what did not occur at that time and between then and now. For example, Mr. Burnett said nothing about his grandfather's death, or his reaction to it, on July 13 or 14 when he was in court. He made no mention of his grandfather's death, its effect on him or his supposed thoughts of suicide upon hearing this news when he met with the probation officer on July 21, 2009 (a week after the guilty plea). During this session, the probation officer

---

[9] With the benefit of having done research and having reviewed at least Dr. Voskanian's report, Mr. Burnett employs phrases and self-diagnoses such as "I was overwhelmed at the time," "I wasn't thinking clearly at all," Motion Hrg. 2/1/10 N.T. 7, "I...[didn't care] so much.", Id. at 9, "At that point in time I just didn't care anymore." Id. at 14, "I basically just gave up." Id., "I was blank." Id. at 27. These phrases echo concepts that Dr. Voskanian uses throughout his report and his testimony which, of course, Mr. Burnett heard promptly before he himself testified..

[10] Mr. Burnett's testimony at the Motion Hearing made repeated references to his dissatisfaction with his lawyers' advice, notwithstanding his earlier sworn testimony to the contrary. For example, he believes that there were a number of motions that should have been pursued and that he says he still wants to pursue. Motion Hrg. 2/1/10 N.T. 10-13; 27; 31;33; 41; 45.

actually evaluated Mr. Burnett as "cordial," "open," "laid back," and "articulate." Motion Hrg. 2/1/10 N.T. 57-62. In fact, during the meeting with the probation officer Mr. Burnett made no mention whatsoever of his grandfather having just died; no mention of concerns about the guilty plea; no mention of concerns about unfiled motions; no regrets about having agreed to the 25-year sentence; no mention of having thoughts of suicide or feeling depressed. Id. The probation officer observed Mr. Burnett interacting "normally" with his lawyer and saw no animosity between them. Id. at 62. The probation officer's observations of Mr. Burnett on July 21, 2009 are consistent with the Court's own observations of Mr. Burnett at the guilty plea hearing a week earlier and throughout the pendency of this case.

In conducting the competency analysis in this case, the Court must look to the plea colloquy. For example, in United States v. Hopson, 250 Fed. Appx. 502 (3rd Cir. 2007), the defendant sought to withdraw his guilty plea by arguing that he had been mentally incompetent, by reason of a bi-polar disorder, at his initial change of plea hearing. Rejecting the argument, the court observed that the record from the hearing contained

> the affirmations of both counsel on the day of the plea hearing that Hopson was competent to plead guilty and the District Court's own observations that Hopson was competent to plead.

Id. at 505; see also United States v. Carroll, 179 Fed. Appx. 128, 132 (3rd Cir. 2006) ("the record demonstrates that [defendant] was mentally competent when he entered his guilty plea and that the plea was intelligent and voluntary, and, therefore, valid"); United States v. Matvia, 112 Fed. Appx. 226, 227 (3rd Cir. 2004) ("The keystone of [defendant's] case is the suggestion that he was not mentally competent at the time he entered the guilty plea. We carefully reviewed the

transcript of the plea hearing and it belies [defendant's] contention."); United States v. Trott, 779 F.2d 912, 913-14 (3rd Cir. 1986); United States v. Allen, 668 F.Supp. 969, 976 (W.D. Pa. 1987).

During Mr. Burnett's plea hearing on July 14, 2009, he was calm, collected and responsive; he manifested no stress, no upset and no distractions at all. Mr. Burnett was focused and in control and gave the Court - - and counsel - - no hint of any of the "stressors" - - chronic or acute - - that Dr. Voskanian opines on July 14, 2009 were causing Mr. Burnett to be "likely somewhat more incompetent than competent." Of special import to the Court, Dr. Voskanian also stated that the stressors then apparently impacting upon Mr. Burnett did *not* prevent Mr. Burnett from telling the truth - - or from appreciating the importance of telling the truth - - at the guilty plea hearing. Motion Hrg. 1/28/10 N.T. 54. Dr. Voskanian also admitted, that the *only* indicator from the actual guilty plea hearing to support his opinion about Mr. Burnett's competence that day is Mr. Burnett's possibly enigmatic statement "I cannot say I am feeling good." Id. at 60. Given the serious circumstances in which Mr. Burnett found himself on July 14, 2009, the Court considered Mr. Burnett's description of how he felt to be wholly appropriate and understandable. Defendants preparing to plead guilty to multiple serious felonies rarely describe themselves otherwise. In the final analysis, Dr. Voskanian even had to admit that his opinion addressed what was "probably" going through Mr. Burnett's mind at the time of his guilty plea. For all these reasons, Dr. Voskanian's evaluation falls far short of meeting the burden Mr. Burnett must carry to withdraw his guilty plea.

## **CONCLUSION**

Neither Mr. Burnett nor Dr. Voskanian, with their focus essentially on energy level and motivation, ever addressed Mr. Burnett's rationality on July 14. Hence, they do not address the

requisite legal standard. Given the totality of the circumstances in this case, the Court concludes that Mr. Burnett has taken his cues initially from his own research and instinct for manipulation.[11] Having given Dr. Voskanian the verbal raw material to work with, Mr. Burnett then finishes his testimonial arguments with flourishes drawn straight from Dr. Voskanian's report. Fundamentally, however, none of what either Mr. Burnett or Dr. Voskanian has expressed to the Court comes from the actual record in this case. The Court will not give credibility to this virtually exclusively subjective self-assessment and self-diagnosis of incompetence, even with the added professional veneer.

Accordingly, the Court has denied Mr. Burnett's motion to withdraw his guilty plea and has set Mr. Burnett's sentencing hearing date.

BY THE COURT:


  /s/ Gene E.K. Pratter
Gene E. K. Pratter
*United States District Judge*

---

[11] Even Dr. Voskanian's report supports the Court's assessment of Mr. Burnett's manipulative skill sets: "[T]he defendant resorted to statements, which may leave a listener in an uneasy state. Mr. Burnett practically is making suicidal threats should he not receive a lighter sentence. In part, this can be explained by the defendant's characterological traits." Rpt. at A16.